May it please the Court, Thomas Ogden on behalf of Petitioner He Lan Ying. I'm going to get right into it, Your Honor. My initial observations, this is an adverse credibility case in an asylum matter. I looked through the record. What I didn't find in the record were any demeanor determinations or any expressed nonresponsiveness. I do a lot of these cases, and usually I see in my other cases when I get an adverse credibility determination, I see a lot of comments on the demeanor or nonresponsiveness on part of the case. Counsel, could you help me on what's bothering me about this case? Some of what the IJ and the BIA noticed, no letters from other people about the pregnancy and the marriage or not marriage and abortion, did not impress me because I thought I can see why a lot of girls wouldn't want to write home about their boyfriend getting them pregnant and then leaving them or being with some other girl and why a lot of girls, the last people they'd want to tell about all this sordid stuff is their parents. That I could see. What I couldn't see and had trouble with was her work records. The issue came up, did she take a week off for the abortion or a month off, and was she docked or was she, what happened then? And she said she submitted all the work records, and the IJ said, well, I don't have August here, which is the month that all this supposedly happened in, and she said, I submitted it. And he said, it's not here. And she said, you have all I had. And it looks to me like that's important. We don't have the month that counts. Why isn't that enough? On that payroll, it's very interesting. I went back and looked at the record, and with regards to the testimony going back and forth, was it a week or a month, it's that administrative record, 126. She recanted pretty much immediately. Oh, well, I'm sorry. I read that. So let's assume for purposes of our discussion right now that it was just speaking under stress, she said a month meant that we corrected it. Let's assume that for purposes of discussion. Early on, I think she shot herself in the foot when she was jumping around. She started out in L.A. with one attorney. And at administrative record 86 through 88, they actually, in a calendar hearing, they discussed the payroll. Now, the intent, my read, of submitting the payroll evidence was because they had a one-year issue. She came in without inspection. So she had to prove that she owned this. I understand what I'm asking about is where is the August payroll document? I understand, Your Honor. That is a discrepancy there. I don't know. It looked even at the master calendar. They submitted copies and said, we may have submitted this at the asylum office. Did they ever submit the August payroll document? It wasn't submitted. There's some confusion there. It wasn't submitted. Am I correct in recalling that that's the only month that matters here? That is a very important month, yes, Your Honor, because to the judge, the immigration judge, he said, well, it looks like these payroll records would show whether or not. We don't have a hospital record, and we don't have the payroll record. And she had more than two years between when she snuck in and when the hearing was. Yes, Your Honor. And she got other records. She got other payroll records. She got up, and I think her intent was to get the other payroll records, obviously, to prove. But she was adamant she got all the way through December. I could sort of see why the IJ didn't believe her, because when I read her testimony, it made me skeptical. But we don't get to find facts, so that doesn't matter much. Understood, Your Honor. Why are the missing August payroll records consistent with her story, that they docked her? She wasn't paid for the month of August. And the other question I had about that is we don't know when in August the abortion took place. So if she took some time off in August and she wasn't paid in August, I had just the opposite reaction, which I'd be a lot more concerned if she had August payroll records, because she shouldn't have been paid that month if she's testifying truthfully. Yes, Your Honor, and I would think that it's definitely a point that the IJ, you know, I think. Since we're all giving our impressions, let me give the middle impression. Okay, thank you, Your Honor. Okay, the middle impression I had is did the IJ ever say to her when she said, I did have it, but I guess you could say she changed lawyers. She thought one lawyer turned it in. Did anybody say to her at the hearing, you know, you need corroboration for this, and can you see if you can get the payroll records now or copies or any confirmation of it? And that's what you would need for corroboration, and we'll give you an opportunity to bring those in now. Your Honor, I didn't see any opportunity given. In fact, with regards to corroborating letters, the IJ kind of in a fast fashion just went through, did you get a letter from your parents? No. There's no follow-up question as to why not. What about, I did see something. It looked like at the preliminary hearing, June 22, 2006, the IJ said December 6 is your deadline to submit any and all supporting documents, and the IJ told these lawyers that the case was subject to the corroboration requirements of the Real ID Act. Yes, Your Honor, that is correct, but I think Your Honor's point was that with regards to identifying a specific group of documents that may have been easily corroborated. She said she thought she had submitted it, right? She did think she had submitted it. Then they told her she'd given them all to a lawyer, she said, but then she didn't know what he had submitted or not. And did they say the one that we want is the August one, and can you go back and get it for us? I didn't see with regards to that specific payroll, and again, I was going back to the reason the payroll was submitted because I think the initial attorney's thinking, I've got to prove up that this was applied for within one year. Don't take anything any of us says as our final opinion on the subject, but these are all points I think that each of us has raised that we each have an interest in, and I think do you want to save any time for rebuttal? Because I think the government may have something to say about these points, and you may want to reply. Sure. I'd just like to make one more point on the letters and the medical verification. The country report is at 157. They do talk about the draconian surveillance state in China where they're going to read your mail potentially going overseas. Oh, no. We wouldn't want anyone making crack of your mail in this country. Oh, yeah. I understand. Counsel, I think we understand that. Could you get to my point, please? I just want to make sure you have an opportunity to respond. What's bothering me is the inconsistency between the amount of time after the abortion when she fled to the countryside. I find that one toughest, and I'd like to give you an opportunity to respond to that. Thank you, Your Honor. I looked at that, too, and that, you know, at the highest level, it's a pretty big discrepancy, but what I noticed was the first time it was brought up was by DHS in closing argument. They pointed that discrepancy out, and the fact is so strange, but there's no why is this fact here? I asked the respondent when she was testifying. I didn't see it in testimony. So this goes to Judge Reinhart's point. You think she wasn't given a fair opportunity to explain the discrepancy? I would say that. All right. Thank you. Thank you, Your Honor. I have a little bit of time on reserve. Thank you. Well, welcome to California. Sorry? Welcome to California. Oh, thank you, Your Honor. Good morning, Your Honors. Annie Sanatana on behalf of the respondent, Attorney General Eric Holder. Your Honor, just to quickly make two corrections or clarifications to the Petitioner's points. In regards to the claim that Ms. He made a misstatement about having the August payrolls in the record on page 125, the immigration judge asked Ms. He specifically, did you file, do you have the payroll for August 2004? Ms. He responds, yes. The judge says, where is it? It's not filed in the record. She says, yes, August 2004. Further down on the same page, the immigration judge says, you don't have it. This is, sorry, Ms. He asking the immigration judge, you don't have it. The immigration judge says, you just said that you did obtain it. Why don't you have it? And Ms. He says, I don't know why. So Ms. He had an opportunity to explain the absence of the payroll. Well, short of counsel, but wasn't all of this done with an interpreter? Yes, Your Honor. Right. And so when I read this transcript, the thing about it that seemed odd to me, there's a point where the immigration judge gets frustrated and says to the interpreter, does she understand Mandarin? And they clarify, yes, she does. But, and so quite, setting aside credibility completely, I had a question about the interpretation that was going on, because there seemed to be several responses that aren't responsive. You know, someone asked her why, and she answers how, several times in the record. And the point, the page you're pointing to is one of those places where it seems to me that there just wasn't good communication. Did you want to comment on that? Your Honor, notwithstanding the fact that Petitioner did not raise, at any point during the proceedings, raise any issues about the interpreter. Petitioner was counseled. This is not in the Petitioner's appeal to the board and not in the opening brief to this Court. There were no issues with the interpreter. Well, why is the transcript so poor, then? Were there responses that aren't really answering the judge's question? Your Honor, I would say that I didn't, the point that you mentioned about where the immigration judge does turn to her and ask about whether or not she speaks Mandarin, I do agree with you that there did seem to be a disconnect in terms of the interpretation. And the immigration judge turns to Petitioner and asks and gives her an opportunity, do you understand the interpreter? Petitioner was counseled. She asked her, do you understand Mandarin? And she says, yes. But that's quite different. Right, because there are a couple links there where we could have a, where the language could be bobbled. And one is interpreting it back from Mandarin to English. And I just couldn't get my arms around it because it seemed to be a transcript that was unique in this regard. Yes, Your Honor. And just in response to that, I would say that, again, Petitioner's counsel did not make any issue regarding the interpreter. And Petitioner, the immigration judge asked Petitioner time and time again if she understood what was going on and questions were repeated. Petitioner had an interpreter throughout the proceedings from 2005 until 2007 when the merits hearing took place. And there's never been any claim on the part of Petitioner or her counsel that there were any due process issues regarding an interpreter. Thank you. Petitioner could have maybe had the opportunity even in the opening brief to the board, or sorry, in the appeal to the board to raise any issues. Well, I'm not sure they didn't, though, counsel, because the whole issue here is all about credibility, as Judge Kleinfeld noted from his opening question. This is all about credibility. And there aren't negative demeanor findings. This, I think, but please correct me if I'm wrong, I think the credibility determination rests entirely upon inconsistencies in the testimony. Is that right? I would say, Your Honor, not just inconsistencies, but in the failure to provide these documents at the immigration judge sites, which could have rehabilitated her testimony. And, again, under the Real ID Act, which the immigration judge specifically pointed out, was the standard during what I would describe as the pretrial portion of the proceedings in an October 2005 hearing, and then again, I believe, in June 2006. The immigration judge points out this is a Real ID case. The standards are different as opposed to pre-Real ID. The immigration judge notes that certain sites are giving you an opportunity to submit documents in this court, and I don't see these documents. Would you like an extension or continuance in order to provide these documents? And so Petitioner was unnoticed, for lack of a better word. Forgive me for interrupting, but I don't want to use up all your time. You just said there was a place where she was given an opportunity, an extension, a request to ask if she wanted an extension. Where is that? That's in the pretrial. I believe it's page 175 of the record. Let me just confirm that. Okay. I believe that's page 79 and page 80 of the record, Your Honor. Thank you. And just the other correction that I would like to point the court towards is that I believe, Judge Christin, you had mentioned that Petitioner or the record didn't indicate when the abortion was. On page 105 of the record, Petitioner was asked when the abortion was, and she states it was August 6, 2004. So why should I be concerned if it's early in the month? And thank you for that clarification. If it's early in the month, why should I be concerned about the absence of payroll records for August? Isn't that arguably consistent with your testimony? Your Honor, no, because I would disagree with that, because Petitioner also testifies on page 131 of the record that she worked until December. But that's a different discrepancy, and that's the one I indicated that I'm a lot more concerned about. Because at one point she says I went to the countryside right away, and at one point she says she worked through until December. I just sort of put that in a different category. That's the inconsistency I am concerned about. I'm not particularly concerned about the absence of payroll records. Well, Your Honor, I would say in response to that, again, under the Real ID Act, that the case should be looked at or the inconsistency should be looked at under the totality of the circumstances. And so in looking at that, I wouldn't isolate necessarily the inconsistencies. And I would also encourage the court to look at, for instance, the country report, which states on page 158 and page 354 of the record that unmarried women in China are not necessary. It doesn't state that they're subjected to forced abortion. The country report states that these individuals have social compensation fines levied against them. And so this is another one of the factors that the immigration judge took into consideration in reaching the average credibility finding. Tell me if I have something right here. I have two questions, actually. The first is just to confirm. The abortion is August 6th. In her testimony, she says she took a month off from work or was required to take a month off from work, but then she immediately corrects it to a week off from work. If it was a week off from work, then she would have had payroll records showing pay for about three weeks in August. Is that right? According to her testimony, that would be correct, Your Honor. That's the way it all came out in the testimony? Yes, and that's when the immigration judge then asked for these payroll papers so that she could look at them. It would have been a payroll record for August showing three weeks' pay if what she was saying was true. Exactly. And if you look at the ‑‑ Unless she fled to the countryside right away. And that's what we don't know, right? Right. That's the question. Unless you can tell us where we've got that discrepancy answered. I'm sorry, please repeat the question. I think you've answered it. And just pointing out, that's the inconsistency. Yes, that's the inconsistency. And just to note, on the payroll papers, there is a column for sick leave. And so that's what the immigration judge was referring to. She would be able to look there. I think I interrupted Judge Kleinfeld. Sorry, Judge. I thought the payroll records showed that she worked through December. The payroll papers that Petitioner submitted only go through July 2004, from January to July 2004. And so that's the question. Is there something that said she worked through December? That was her testimony before the immigration judge. Yes, Your Honor. My other question was this. The BIA says that the respondent has not submitted any letters from family members or friends. Now, they said other things, too. But when I read that, my thought was, who would write about this to family members and friends, that they got pregnant by their boyfriend and their boyfriend is messing around with another girl and maybe he's going to marry her and maybe he isn't and maybe she'll get an abortion. Who's going to write home about that? Well, you never know, Your Honor. She doesn't say that her family didn't know. Why would it tend to prove that she's lying, that she doesn't have letters to family about that, unless it's the sort of thing that you would expect anyone to write home about? Your Honor, well, two responses to that. I wouldn't necessarily the immigration judge doesn't hang her hat on this one or the agency doesn't hang its hat on this one failure to submit the letters from the family members. And secondly, in the immigration judge's decision, she states, she explains that petitioner, she would have thought it reasonable for petitioner to submit something from her family members to corroborate her testimony. What would it be? Sorry? What would it be? Oh, no, referring to the letters, again, the letters from family members. Yeah, that's what I'm asking. What letters would there be that would tend to corroborate any of her claims? So usually in cases like these, there might be a letter from a mother, a father, a sibling saying that she knows that a petitioner had undergone some. Yeah, but why would that happen? Usually the letters we get, whether they're fraudulent or true, you better not come home. There are people who come around the house looking for you, that sort of thing. In this case, I keep trying to think of what letters there might be that would corroborate, and I can't think of any. Well, this would strengthen her claim, Your Honor. If, you know, and this goes back to the immigration judge at the very beginning asking petitioner for certain evidence or asking. It would strengthen her claim, but we're supposed to look at whether or not the corroboration would reasonably be available. And I think that's Judge Kleinfeld's point. It's much easier for us to understand that that kind of letter wouldn't be available. And yet it's being cited as a reason for finding that she lacked credibility. As one reason, Your Honor, under the totality of the circumstances. Again, this is just one instance that the immigration judge finds. This is not core where the immigration judge says or is punishing her because of her failure to submit evidence. The immigration judge, again, on page 11 of the immigration decision says, looking at the totality of the discrepancies, that they do raise the issue that Respondent is not credible in her claim. The immigration judge is not punishing or ambushing the petitioner for the failure to provide letters from family. She states the payroll papers would have been helpful, a prescription from the clinic, or showing that in support of petitioner's claim that she'd suffered from severe bleeding after the abortion. A letter from the clinic where she'd gone for the pregnancy test. The immigration judge cites several pieces of evidence and asks petitioner during the hearing whether this is some evidence that she has. And this is all the immigration judge trying to assist the petitioner to bolster her claim or to make the best claim possible. Well, I mean, I think some of that is partisan. The question, do you have it, is different from can you get it. But I'm more concerned about what Judge Christen is and I think Judge Kahnfeld about whether she went back to work and whether there were payroll records beyond July. Was that the last month? That's correct, Your Honor. And she gave payroll records to her lawyer and she says she thought those were all the records. But maybe your opposing counsel can explain why there are no records for August on. Maybe whether she knew or not or whether her former counsel knew or whether she understood that she should, I don't know. I mean, I'm constantly surprised at the records that are obtained from Africa and Asia. But maybe there was a way for her to get records. We don't know really from this record whether she actually worked after August or didn't. I mean, that's all very unclear. And I don't know whether that could have been cleared up if she had a competent lawyer who tried to get confirmation of something. But could you read from page 79 or 80 where, I'm sorry, I don't have the transcript with me, what it said about telling her to get records? Regarding the payroll? Whatever, where she was told you need to get these records. Oh, so, yes, Your Honor. So in the middle of the page, page 70, the immigration judge says, ma'am, this is a case under the Rail ID Act and also you're required under the new law to comply with certain instructions for biometric information. You have a reasonable time to comply. I'm going to set your case for status to see that you have complied on January. And then on page 75 of the record, on June 22, 2006, this is a different hearing. The immigration judge says, the deadline to file any additional documents is going to be December 6, 2006. I do note the case is subject to the Rail ID Act, so any and all supporting documents that's reasonably available should also be submitted and all the originals should be available on the day of the hearing. Is that clear, counsel? Yes, Your Honor. And then on page 79 of the record, the immigration judge, in going through, I believe this may have been where the immigration judge was admitting evidence into the record, she asks if the petitioner has an abortion record or abortion certificate, rather, because she doesn't see that in the evidence. And at that point, petitioner's counsel states that she will get a medical examination in order to show some probative value as to the abortion. Page 87 of the record, petitioner's counsel requests some additional time. This is towards the bottom of the page. The immigration judge says to counsel, it sounds like both parties need to file additional material, so let's set this case out for an individual hearing. I have next week, Monday afternoon. So let's put it there, and if you're both ready, we'll go forward. So, Your Honor, yes, petitioner had ample opportunity to submit these documents. But that doesn't answer the question of whether she was told. She said she thought that her counsel had all of her records. Nobody told her that there were no records after July. Regarding the paper. What? Pardon me? I think we're talking about when she states that, Your Honor. We're going towards the payroll papers. Yes, that's what I'm asking about. Yes. So that's on page 125 of the record. And petitioner's counsel did not follow up at that point and explain where the records were. No, what I was asking was, did anybody ever say that the payroll records after July are not here? You need to get those records. No, Your Honor. Petitioner's counsel does not state that. Petitioner's counsel does not follow up or ask for a continuance or an extension to see where these documents are. There's no need to report. No, I asked, did anyone ever say the documents from July on are missing? Well, yes, the immigration judge says that on page 125 of the record, Your Honor. That's where the immigration judge. They're in the hearing. You're in the hearing. So petitioner's counsel is there, petitioner is there, and the immigration judge. And those are what you need to get. Absolutely. That's on page 125. And petitioner states, I submitted them. The judge says, you don't have them. And she says, nope. The judge says, why don't you have them? And Ms. He's response is, I don't know why. And this is what I'm seeing, Your Honor. Petitioner's counsel. Did you have a lawyer there who could stand up if you wanted to and say, Your Honor, I can. Yes. May I have an extension or a continuance to try and figure out where these documents are, whether they exist. You did have a lawyer there. She did, yes, Your Honor. She was represented throughout the entire proceedings. So if there are no further questions, Your Honor, the respondent will rest and just like to say that because Ms. He has failed to identify any evidence compelling a conclusion that's contrary to the one reached by the agency, we would ask that the court deny the petition for review in this case. Thank you. Counsel, we'll give you a couple of extra minutes. Thank you, Your Honor. I just need a few just to clarify. And on this payroll issue on these documents, the way I'm thinking, again, the inconsistency was made because the assumption was you submitted these payrolls to prove your asylum case. But as I said before, we submitted it to prove that we filed the application within one year. So the intent of Petitioner when she initially filed these payroll documents was to prove that she was eligible for asylum. Why does that matter? Because later on they think everything's settled, they submitted it, and then later on it becomes an issue because a new judge gets it for the first time, evaluates it and says, well, this could corroborate your claim. To meet the one-year period? No, no, no, to go to the asylum claim. And if the August payroll records were there and they showed that she missed some time, then it corroborates the fact that she's testifying that I had a forced abortion at the beginning of August. So Petitioner's intent of submitting those documents for a completely different point early on in the proceeding to get around what may bar her from asylum, it later on becomes an issue at the end of her merits where the judge looks in and goes, oh, wow, we have some really good... Right, right, but again, why does that matter? You said because she submitted it and she's trying to get another one-year deadline and then that gets resolved, I think is what you said, and they move on. So it still comes back to Judge Reinhart's question, were they submitted or not? Yes, and I backtracked just a little to the initial calendars, and they do tell you, this is subject to the Real ID Act, you need to submit corroborative evidence, but it becomes a boilerplate by the judges, a boilerplate type of notice to people. They don't quite know at the time what they would like to see as an immigration judge. Well, was there a point, maybe you're just not saying something that you know that we don't know, but was the one-year asylum deadline sort of a contested issue and then at some point that got resolved? It was never an issue. But what was the point of submitting records up through, up until July and not submitting any from then on? Because I think she filed her asylum application around June. So it was a timeliness issue. Yes, it was a timeliness issue. I was having trouble following why you said they were submitted to prove a particular point. Yes. The point is that it was within a year. Yes, so it becomes a little bit of a philosophical question. Well, can you be inconsistent when your intent of submitting these documents was for a different purpose and not to prove the case? You know, it all became real clear in the bottom half of page 125 here. She had a lawyer right there. If she had more records and the lawyer could have submitted them, he could have said so at that point, asked for 10 minutes to go downstairs to the Xerox machine or asked for a couple days or to submit them after the hearing or anything. Yes, Your Honor, I think her confusion was, it seems, at the beginning, even when they're submitting. I'm not talking about her confusion. She's on the witness stand, but her lawyer's right there, and he can see and hear and understand what's going on. Yes, Your Honor, and I would say he had a little bit of respect. Where is August? You don't have it? You just said that you did obtain it. Why don't you have it? I don't know why. That's the kind of thing that makes you break out in a sweat and look at your file. Yes, I agree, Your Honor. I don't know why. I think she does say I gave it to originally probably at her asylum interview because early on they said we did have the originals because when they were submitting to the judge at initial calendars, I think they were Xeroxed, too. So there's a question of the originals all the way going back to initial calendars where you're submitting these documents. I'm not getting this explanation. I mean, one kind of excuse is, well, I didn't have a lawyer, and another kind of excuse is, well, I did have a lawyer, and he must have messed up. No matter what, there's some kind of excuse. But I don't understand why the IJ and BIA have to accept it. Well, I would think in a sense there is responsibility on the lawyer's part, but also the IJ does these aren't adversarial proceedings in the sense of a district court proceeding. They're a little bit different for asylum. I think the IJ does have a duty to kind of get to the truth. Notify them that this is the corroborating evidence we need, and then to say you may, if you don't have it with you and you don't know, you're going to have to bring in that evidence or you're going to lose the case. Yes, Your Honor. Now, it may not be enough to say the lawyer say, I don't know where it is, I don't have it with me, although he might be able to go find a way to get it if he's notified that this is necessary, which might have happened, depending on your view, might have happened at the hearing where they said to him, you need this evidence, corroborating evidence. This is what you need. Yes, Your Honor. And if he said that to him, or you could imply that he said it to him, then the question is does he, should he say, all right, I'll give you time to try to find it? Agreed, Your Honor. That is the question. Why isn't that the question? Why isn't the IJ putting that quite plainly on page 125? Start with line two. Line two. Well, Your Honor, it is a pretty in-depth discourse on it, but I don't see any necessarily any follow-up. I don't have the transcript. Did he say you may have an opportunity to find this? No, Your Honor, I don't see that. That's probably the best. This discourse establishes that the IJ wanted to see it, and that petitioner didn't have it, but there's no question of can you get it, I don't see. Okay. So we will have to interpret this for ourselves. Yes, Your Honor. Petitioner Ress. Did you bring it to court today? I submitted all of them. The only ones that were submitted was February. Would your application for February, March, April, May, June, and July? Where is August? The question we've all been asking. You don't have it? The lawyer said he thought they had August. You just said you did obtain it. Why don't you have it? I don't know why. Do you have any cut? No, then he goes on to medicine. Okay. The question is whether he was given proper notification of what's needed and an opportunity to produce it. Yes, and I would just, as a final point, what ties into that discourse is different attorneys, different judges back at Administrator Record 82 were the originals they're trying to find them to on these documents. What does it say of 82? It goes on a submission on a calendar. Let me see. I think this is I.J. Bass instead of Beamer, who was the trial I.J. Okay. And I'm sorry, Counsel, did you say that you were going to get the payroll document? Do you have the original payroll document? I don't have it here. I will determine whether we submitted that at the asylum interview or what happened with that, so I will get in touch with government counsel regarding that issue. I think in 08, there's a big ‑‑ And you had submitted the payroll document up to August. Not clear. I looked in the record, and I looked at the submission at the asylum. Sometimes you go to the asylum office, you take your documents, because that would have been ‑‑ the timeliness issue would have been an issue at the administrative office, too. She had to prove that she had applied within a year to the asylum officer before it got into the court system. There is an issue, definitely, yes. Thank you very much. Thank you, Your Honor. Thank you for your time. Respectfully submitted. Respectfully submitted.
judges: Reinhardt, Kleinfeld, Christen